UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WILLIAM JACKSON,<br><br>　　　　　　Plaintiff<br><br>　　v.<br><br>KELLY NOVACK, *et al.*,<br><br>　　　　　　Defendants. | CIVIL ACTION NO. 3:25-CV-00745<br><br>(MEHALCHICK, J.) |

**MEMORANDUM**

After his case was closed, Plaintiff William Jackson filed an amended complaint against 11 defendants affiliated with SCI-Benner Township ("SCI-Benner"). (Doc. 8). For the reasons described below, the Court will reopen Jackson's case, grant him leave to proceed *in forma pauperis*, and permit him to proceed on First Amendment retaliation claims and state law negligence claims against two defendants.

**I.　BACKGROUND AND PROCEDURAL HISTORY**

Jackson filed his initial complaint (Doc. 1) without paying the filing fee or seeking leave to proceed *in forma pauperis*. When the Court set a 30-day deadline for him do so, and he did not comply, his case was dismissed. *See* (Doc. 3, Doc. 4). After the case was closed, he filed an application to proceed *in forma pauperis* (Doc. 5), an amended complaint (Doc. 8), and a letter (Doc. 10) requesting that the case be reopened. He indicates that he did not receive the Court's April 28, 2025, order addressing the filing fee, and attaches a form indicating that the mailing may have been returned rather than delivered to him. *See* (Doc. 10-1). Upon review, the Court will reopen the case and accept Jackson's amended complaint as the operative complaint.

The complaint alleges as follows: On March 27, 2025, Jackson, a prisoner at SCI-Benner, was returned to that facility after a temporary transfer to SCI-Phoenix for court proceedings. He was placed in administrative custody in the Restricted Housing Unit, and was told that he would have to be "cleared to [return] to General Population, although he did nothing to warrant this attention." During this time, Jackson was denied family visits, commissary purchases, and other privileges afforded to General Population. Further, a box containing his legal property was "not in the jail and unaccounted for," although he had been told it was delivered to SCI-Benner. This box contained "discovery, . . . legal books, composition books, affidavits, notes, and legal references." Jackson was eventually told by unnamed staff that Defendant Captain Harper "had ordered security to take [his] legal box."

Jackson made requests to various staff members asking to be restored to General Population. Counselor Lewis, who is not a defendant, told Jackson that she sent an email to Defendant Kelly Novack, and it would be "taken care of within 24 hours." However, by March 31, 2025, Jackson's status had not changed. Lewis told Jackson that she did not know why his custody status had not been adjusted, and agreed to file a grievance on Jackson's behalf, which Jackson had already prepared. Next, Jackson approached Unit Manager Baumgardner, who asked Jackson why he did not inform her about this issue in the first instance. Jackson told Baumgardner that Lewis had offered to help resolve the issue, but had been unsuccessful, so Jackson had filed a grievance. Baumgardner "seemed to get upset and asked ['W]hy would you file a grievance[?'] . . . [then] walked away shaking her head."

On April 2, with his status still unchanged, Jackson "became emotional and distraught and began to have suicidal thoughts due to not being able to see his aging mother and order the appropriate commissary that's afforded to every inmate who lives in General Population."

He asked to be taken to a Prisoner Observation Cell ("POC"), where potentially suicidal inmates are monitored. In the POC, he met a Program Review Committee consisting of Defendants Stavola and Rossman. He told them about his custody status issue, and they allegedly told Jackson "that they would fix the matter."

On April 3, Jackson raised the same issues with a Psychiatric Review Team consisting of Defendants PSS Lowman and "PSS D." Jackson told them that his suicidal thoughts were caused by his inability to receive visits from this mother and his lack of access to commissary. These individuals allegedly told Jackson "that his custody level was fixed and he wouldn't have to worry about anything and he would finally be able to get a visit from his mother and order commissary as well." However, when Jackson was released from the POC, he was apparently returned to administrative custody status. The next day, April 4, a nurse reviewing records told him he was being reassigned to D-Block, which Jackson alleges was "inherently impossible due to D-Block being shut down." This part of the complaint is unclear, but Jackson believes that unspecified staff intentionally gave him a phony cell placement, which could never be fulfilled, in retaliation for his prior grievance.

On April 7, with his custody status still unchanged, Jackson attempted to commit suicide by hanging himself with bedsheets. He suffered injuries to his neck and was taken to a hospital. Upon returning to SCI-Benner, he was placed in the POC, where he raised his custody status issue with Defendant Counselor Walters. Walters allegedly "explained to Jackson that he was aware of his housing change, and Jackson should have never filed a grievance." Jackson "kindly asked [Walters] to leave and never bother him again."

On April 9, Defendant CO Detwiler allegedly told Jackson "that he accidentally broke Jackson's TV and typewriter while moving property around in the property room." Jackson,

3

believing that this was not an accident, threatened to file a grievance. Detwiler allegedly said: "If you file a grievance, more of your sh*t is gonna get destroyed . . . Captain Stavola told me to break your sh*t up. He's tired of you filing grievances so you're on your own. You've never given me a problem[,] that's why I'm letting you know not to file any more grievances." Detwiler continued: "I just received sh*t from Captain Harper in Security for giving you a confiscation slip for your typewriter. That's really [what] they don't want you to have, so don't be surprised if you get another confiscation slip tomorrow." Detwiler's confiscation slip[1] indicates that a broken TV and typewriter were confiscated from Jackson and "disposed." *See* (Doc. 8-1). On April 10, Harper issued an amended confiscation slip, which "superseded" the prior slip. This slip showed that a typewriter and a USB cable had been confiscated from Jackson, but the reference to the TV was removed. *See* (Doc. 8-2).

On April 14, Jackson was informed that he would be taken to General Population, but "before Jackson could leave," he was informed that he "had to go to the RHU for a misconduct." A misconduct report, written by Harper, alleged that Jackson had been hiding a USB mini cable in his typewriter, which was discovered when staff accidentally broke it on April 10. *See* (Doc. 8-3). Jackson believes that the misconduct was retaliatory, arguing that there are factual errors in the report, including that the typewriter was in fact broken on April 9. However, Jackson did not file a grievance contesting the misconduct, allegedly because he was "deterred and scared of the retaliation that was sure to ensue."

Jackson asserts the following claims against Defendants Novack, Baumgardner, Walters, Stavola, Rossman, Lowman, and "PSS D": Eighth Amendment claims of deliberate

---

[1] The copy of the document attached to the complaint is not fully legible, but arguably indicates that Detwiler "accidentally damaged" unspecified property. *See* (Doc. 8-1).

indifference to his vulnerability to suicide; Eighth Amendment "failure to protect" claims; Fourteenth Amendment equal protection claims; and state law claims of intentional infliction of emotional distress ("IIED"). With respect to his lost property, Jackson asserts violations of his First Amendment right of access to the courts, and state law claims of negligence and IIED, against Defendants Stavola, Detwiler, Ryan, Harper, and Liptak.[2]

## II.   28 U.S.C. § 1915A Screening

Under 28 U.S.C. § 1915A, the Court is obligated, prior to service of process, to screen a civil complaint in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity. 28 U.S.C. § 1915A(a); *James v. Pa. Dep't of Corr.*, 230 Fed. App'x 195, 197 (3d Cir. 2007). The Court must dismiss the complaint if it fails to state a claim upon which relief can be granted. 28 U.S.C. § 1915A(b)(1); *Mitchell v. Dodrill*, 696 F. Supp. 2d 454, 471 (M.D. Pa. 2010). The Court has a similar obligation with respect to actions brought *in forma pauperis*. *See* 28 U.S.C. § 1915(e)(2). In performing this mandatory screening function, a district court applies the same standard applied to motions to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Mitchell*, 696 F. Supp. 2d at 471; *Banks v. Cty. of Allegheny*, 568 F. Supp. 2d 579, 588 (W.D. Pa. 2008).

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes a defendant to move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P.

---

[2] Jackson's complaint largely consists of "conclusory allegations peppered with legal buzzwords" that are insufficient to state a claim. *See Taylor v. Pennsylvania*, No. 17-CV-3369, 2018 WL 6574187, at *26 (E.D. Pa. Dec. 12, 2018). For example, he alleges that various defendants "neglected to exercise a reasonable degree of prudent care to ensure proper policy measures were followed, or enforced" (Doc. 8 at 6-7, ¶ 112), but does not identify these policies or explain how they were not "followed[] or enforced." Nonetheless, the Court liberally construes his allegations and the corresponding claims. *See Estelle*, 429 U.S. at 106.

12(b)(6). To assess the sufficiency of a complaint on a Rule 12(b)(6) motion, a court must first take note of the elements a plaintiff must plead to state a claim, then identify mere conclusions which are not entitled to the assumption of truth, and finally determine whether the complaint's factual allegations, taken as true, could plausibly satisfy the elements of the legal claim. *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011). In deciding a Rule 12(b)(6) motion, the court may consider the facts alleged on the face of the amended complaint, as well as "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

After recognizing the elements that make up the legal claim, a court should "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The plaintiff must provide some factual ground for relief, which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Thus, courts "need not credit a complaint's 'bald assertions' or 'legal conclusions' . . . ." *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (quoting *In re Burlington Coat Factory Securities Litigation*, 114 F.3d 1410, 1429-30 (3d Cir. 1997)). Nor need the court assume that a plaintiff can prove facts that the plaintiff has not alleged. *Associated Gen. Contractors of Cal. v. California State Council of Carpenters*, 459 U.S. 519, 526 (1983).

A court must then determine whether the well-pleaded factual allegations give rise to a plausible claim for relief. "A claim has facial plausibility when the plaintiff pleads factual

6

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Palakovic v. Wetzel*, 854 F.3d 209, 219-20 (3d Cir. 2017) (quoting *Iqbal*, 556 U.S. at 678) (internal quotation marks omitted); *see also Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 262 n.27 (3d Cir. 2010). The court must accept as true all allegations in the amended complaint, and any reasonable inferences that can be drawn therefrom are to be construed in the light most favorable to the plaintiff. *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir. 1994). This "presumption of truth attaches only to those allegations for which there is sufficient factual matter to render them plausible on their face." *Schuchardt v. President of the United States*, 839 F.3d 336, 347 (3d Cir. 2016) (internal quotation and citation omitted). The plausibility determination is context-specific and does not impose a heightened pleading requirement. *Schuchardt*, 839 F.3d at 347.

With these standards in mind, a document filed *pro se* is "to be liberally construed." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). A *pro se* complaint, "however inartfully pleaded," must be held to "less stringent standards than formal pleadings drafted by lawyers" and can only be dismissed for failure to state a claim if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972). Further, the Third Circuit has instructed that if a complaint is vulnerable to dismissal for failure to state a claim, the district court must permit a curative amendment, unless an amendment would be inequitable or futile. *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002).

**III.  DISCUSSION**

   A.  SECTION 1983

Section 1983 is the vehicle by which private citizens may seek redress for violations of federal constitutional rights committed by state officials. 42 U.S.C. § 1983. Section 1983 does not create substantive rights, but instead provides remedies for rights established elsewhere. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985). To succeed on a Section 1983 claim, a plaintiff must demonstrate that the defendants, acting under color of state law, deprived the plaintiff of a right secured by the United States Constitution. *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995). "A defendant in a civil rights action must have personal involvement in the alleged wrongs." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). "Personal involvement requires particular 'allegations of personal direction or of actual knowledge and acquiescence.'" *Dooley v. Wetzel*, 957 F.3d 366, 374 (3d Cir. 2020) (quoting *Rode*, 845 F.2d at 1207).

   B.  EIGHTH AMENDMENT

First, Jackson asserts claims of deliberate indifference to a vulnerability to suicide against Defendants Novack, Baumgardner, Stavola, Rossman, Walters, Lowman, and PSS D. For this claim, Jackson must allege (1) a "particular vulnerability to suicide," meaning "a strong likelihood, rather than a mere possibility," that he would attempt it; (2) that "the prison official knew or should have known" of that vulnerability; and (3) "the official acted with reckless or deliberate indifference, meaning something beyond mere negligence." *Beers v. Cnty. of Northumberland*, No. 23-2555, 2024 WL 2874283, at *2 (3d Cir. June 7, 2024) (quoting *Palakovic v. Wetzel*, 854 F.3d 209, 223-24 (3d Cir. 2017)).

Jackson's theory is that these defendants knew he was having suicidal thoughts because of his allegedly improper placement in administrative custody, so their failure to take

"reasonable steps" to change his custody status constitutes deliberate indifference. Jackson describes, in vivid detail, his emotional distress at his custody status and the attendant loss of privileges. The Court acknowledges Jackson's allegations about the distress he has suffered; however, his complaint does not support an inference that any defendant acted with deliberate indifference to a particular vulnerability to suicide.

First, with respect to Novack and Baumgardner, their contact with Jackson occurred prior to his admission to the POC, so the complaint does not support a reasonable inference that they knew Jackson was at risk of suicide. Nor is Jackson's claim viable against non-medical officers Stavola, Rossman, and Walters. Jackson's allegation that he "explained to [Stavola and Rossman] about being on AC status for an entire week" does not itself suggest their knowledge of a "strong likelihood" that he would attempt suicide. Neither does Walters's alleged statement that he "was aware of [Jackson's] housing change." Regardless, given that Jackson was in the POC, these non-medical and supervisory officers[3] were entitled to rely on the judgments of the medical staff observing Jackson as to what actions were necessary to address his risk of suicide. *See Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004) ("If a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands. This follows naturally from the division of labor within a prison.").

With respect to Lowman and PSS D, medical staff on the "Psychiatric Review Team," Jackson alleges that he explained in the POC that he was having suicidal thoughts because he

---

[3] According to the complaint, Stavola was a correctional officer with "significant controlling supervisory authority" over facility security; Walters was a correctional officer "responsible for the overall management of an inmate[']s programs"; and Rossman was the Deputy Superintendent for Centralized Services. (Doc. 8 at 3-4, ¶¶ 5-8).

had not seen his mother or used the commissary for a week. Allegedly, these defendants assured him "that his custody level was fixed," but upon release from the POC, he found that it was not. Although distressing to Jackson, this erroneous statement was not itself an Eighth Amendment violation. Even if denial of prison privileges[4] could in some way constitute deliberate indifference to a risk of suicide, there is no indication that the Psychiatric Review Team had the ability to change his custody level or deprived him of appropriate medical care.

Jackson separately asserts a "failure to protect" claim against these same seven defendants, which he describes as deliberate indifference to his "physical safety and mental health needs." *See Palakovic*, 854 F.3d at 227 (plaintiffs "wished to pursue a more general claim [that prison officials] were deliberately indifferent to [the prisoner's] serious need for adequate mental healthcare" but did not "directly claim that the prison officials should be held liable for failing to prevent [his] suicide"). Any such claim fails for the same reasons described above.

C. EQUAL PROTECTION

Next, Jackson asserts Fourteenth Amendment equal protection claims based on his custody status. However, to state an equal protection claim, he must plead *facts* showing that he was intentionally treated differently from similarly situated prisoners, *i.e.*, prisoners whose situation was "alike in all relevant aspects." *See Jones v. Sposato*, 783 F. App'x 214, 218 (3d Cir. 2019) (quoting *Startzell v. City of Phila.*, 533 F.3d 183, 203 (3d Cir. 2008)). Jackson alleges

---

[4] Although Jackson claims he "should" have been entitled to General Population privileges, and apparently believes they were medically necessary, a prisoner has no constitutional right to a particular custody status (*see, e.g.*, *Brown v. Wetzel*, No. 1:21-CV-01436, 2022 WL 4647330, at *19 (M.D. Pa. Sept. 30, 2022)), nor the right to dictate what form of medical treatment he receives (*see Manuel v. Atkins*, 545 F. App'x 91, 94 (3d Cir. 2013)).

that various defendants "intentionally treated [him] different" from "similarly situated" prisoners, but simply restating the legal standard as a conclusion is insufficient. *See Morse*, 132 F.3d at 906 (a plaintiff's legal conclusions do not state a claim). The fact that other prisoners received General Population privileges and Jackson did not is also insufficient. Jackson does not plead facts comparing his custody status to other prisoners who were alike in *all* relevant aspects; *i.e.*, those who were returning from temporary transfers and/or suspected of bringing contraband into the prison.[5] Thus, these claims cannot proceed.

### D. Denial of Access to Courts

Next, Jackson contends that various defendants denied him access to the courts by "destroying his typewriter and/or confiscating his legal work." Under the First and Fourteenth Amendments, prisoners retain a right of access to the courts.[6] *See Lewis v. Casey*, 518 U.S. 343, 346 (1996). For this claim, the plaintiff must plead facts showing (1) that he suffered an "actual injury," *i.e.*, he lost a chance to pursue a "nonfrivolous" or "arguable" underlying claim; and (2) that he has no other "remedy that may be awarded as recompense" for the lost claim other than in the present denial of access suit. *Monroe v. Beard*, 536 F.3d 198, 205-06 (3d Cir. 2008) (quoting *Christopher v. Harbury*, 536 U.S. 403, 415 (2002)). The

---

[5] Jackson does not list Harper as a defendant for this claim. He may have intended a claim based on Harper's decision to seize Jackson's legal box and not the boxes of other prisoners, but nothing in the complaint suggests a discriminatory motive for that decision. Jackson claims Harper was retaliating against him for filing grievances, but the seizure of the legal box predates any grievance discussed in the complaint.

[6] Although broadly styled as a "due process" claim, it is clear that this was intended as a claim of denial of access to the courts. *See* (Doc. 8 at 39-42, ¶¶ 120-129); *Bainbridge v. Pennsylvania Dep't of Corr.*, No. 23-CV-4835, 2024 WL 556657, at *5 (E.D. Pa. Feb. 12, 2024) ("To the extent that the [lost property] claim involves legal materials, it is properly construed as a First Amendment access-to-the-courts claim.").

complaint must describe the underlying legal claim well enough to show that it is "more than mere hope." *Monroe*, 536 F.3d at 206.

Here again, Jackson recites the legal standards but does not plead facts supporting a claim for relief. He states that he "suffered an actual injury" and "lost the chance to pursue a non-frivolous lawsuit," and that he could have "defended himself and effectively prosecuted," but does not explain how the alleged deprivations caused him to lose any case. To the contrary, the four cases he identifies are "currently pending." *See, e.g.*, *Abdullah v. Briggs*, No. 4:24-CV-00225, 2024 WL 2902328, at *5 (M.D. Pa. June 10, 2024) (an access-to-courts claim "is plainly meritless" if the relevant case is ongoing). Within his claim for relief, he alludes to a fifth case, in which he allegedly "los[t] a meritorious lawsuit against SCI-Benner Officials," but does not identify the case, describe the underlying legal claim(s), or explain why the loss is attributable to the lack of a typewriter or legal documents. *See Monroe*, 536 F.3d at 206.

E.  **RETALIATION**

Jackson asserts retaliation claims against all 11 defendants. An inmate retains First Amendment protections when they are "not inconsistent" with prisoner status or the "legitimate penological objectives of the corrections system." *Wisniewski v. Fisher*, 857 F.3d 152, 156 (3d Cir. 2017) (quoting *Newman v. Beard*, 617 F.3d 775, 781 (3d Cir. 2010)). To state a prima facie case of First Amendment retaliation, a plaintiff must show that (1) he was engaged in constitutionally protected conduct; (2) he suffered an "adverse action" by prison officials sufficient to deter a person of ordinary firmness from exercising his First Amendment rights; and (3) the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take the adverse action. *Wisniewski*, 857 F.3d at 156 (citations and quotations omitted).

Typically, to show causation, the plaintiff must show "unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action," or "a pattern of antagonism coupled with timing to establish a causal link." *Watson v. Rozum*, 834 F.3d 417, 424 (3d Cir. 2016). The alleged retaliatory motive must be demonstrated by facts, not the plaintiff's "speculation." *See, e.g.*, *Butler v. Kauffman*, No. 4:19-CV-02171, 2023 WL 2601918, at *3 (M.D. Pa. Mar. 22, 2023). Specifically, the filing of prison grievances does not itself establish a retaliatory motive for the actions of every officer at that prison merely because the plaintiff labels those actions as "retaliation." *See, e.g.*, *Muhammad v. Brown*, No. 4:23-CV-212, 2024 WL 3540991, at *3 (M.D. Pa. July 25, 2024); *Murray v. McCoy*, No. 1:21-CV-320, 2023 WL 2285877, at *8 (M.D. Pa. Feb. 28, 2023).

As described in the complaint, Jackson's written grievance and oral complaints to various staff members about his custody status constitute protected conduct. *See Mack v. Warden Loretto FCI*, 839 F.3d 286, 298-99 (3d Cir. 2016) ("Mack's oral grievance sufficiently and timely put prison officials on notice that he was seeking redress, was conveyed to prison officials in a reasonable manner, and concerned conduct that the prison itself prohibits."). However, most of Jackson's claims are not viable. Six of the 11 defendants took no adverse action against him: Novack, Baumgardner, Walters, Rossman, Lowman, and PSS D.[7]

---

[7] Jackson argues that these defendants should have changed his custody status in response to his complaints, but even assuming they were empowered to do so, "a failure to act on a complaint is not a retaliatory or adverse action." *See Monn v. Gettysburg Area Sch. Dist.*, No. 1:12-CV-2085, 2013 WL 1345501, at *4 (M.D. Pa. Apr. 2, 2013) (listing examples), *aff'd*, 553 F. App'x 120 (3d Cir. 2014). Although Baumgardner and Walters allegedly expressed disapproval of Jackson's decision to file a grievance, such comments, even if construed as "threats," are not themselves adverse actions. *See Burgos v. Canino*, 358 F. App'x 302, 306 (3d Cir. 2009); *Snider v. Alvarez*, No. 18-CV-801, 2020 WL 6395499, at *17 n.166 (M.D. Pa. Nov. 2, 2020).

13

The remaining claims concern defendants allegedly involved with Jackson's lost property: Stavola, Detwiler, Ryan, Harper, and Liptak. Allegedly, Detwiler intentionally destroyed Jackson's TV and typewriter, on orders from Stavola, because Stavola was "tired of [Jackson] filing grievances." Because a deprivation of an inmate's property can be an adverse action for retaliation purposes, *see Mincy v. Chmielsewski*, 508 F. App'x 99, 104 (3d Cir. 2013), Jackson has plausibly stated retaliation claims against these two defendants.

The claims against Harper, Ryan, and Liptak are premised on their involvement in Jackson's misconduct charge for storing a USB mini cable in the typewriter. Although Jackson labels this as a "bogus retaliatory misconduct," the complaint does not indicate a retaliatory motive from any of these defendants.[8] To the contrary, Jackson's exhibits indicate that a USB cable was indeed found in his typewriter when it was broken, and Jackson does not contend otherwise.

F. STATE LAW CLAIMS

Finally, Jackson asserts state tort claims of intentional infliction of emotional distress and negligence. In general, Commonwealth employees acting within the scope of their employment are entitled to sovereign immunity from such claims. *See Rosa-Diaz v. Dow*, 683 F. App'x 103, 107 n.8 (3d Cir. 2017); *Burton v. Wetzel*, No. 1:22-CV-1625, 2023 WL 5804324, at *3 (M.D. Pa. Sept. 7, 2023); 42 Pa. Con. Stat. Ann § 8522.

---

[8] Harper allegedly did not "want" Jackson to have his typewriter and drafted the amended confiscation slip on that basis, but unlike with Stavola, there is no indication that this was a response to Jackson's grievances (as opposed to the discovery of contraband in the typewriter). Harper also "ordered security to take Jackson's legal box" when he initially returned from SCI-Phoenix, but as previously noted, that decision predated the grievances described in the complaint.

Two statutory exceptions to immunity are potentially relevant. First, Pennsylvania's sovereign immunity statute provides an exception for certain claims against medical personnel. *See* § 8522(b)(2). However, Jackson's allegations do not state a viable claim against any medical personnel for the reasons described above. Specifically, while he faults various defendants for "intentionally cho[osing] to deprive him of a reasonable opportunity to have his [custody] status adjusted," he has not alleged facts showing that any medical defendant had a duty, or even the capability, to change his custody status.

Second, the statute waives immunity for damages "caused by . . . [t]he care, custody or control of personal property in the possession or control of Commonwealth parties." § 8522(b)(3)); *see*, *e.g.*, *Alexander v. Gennarini*, 144 F. App'x 924, 925 (3d Cir. 2005) (unpublished). The only potentially viable claims under this exception are against Stavola and Detwiler regarding the alleged destruction of Jackson's TV and typewriter.[9] The IIED claims against these defendants are not viable because the alleged conduct, although unpleasant, is not "outrageous in character [and] extreme in degree," nor does Jackson plausibly allege severe emotional distress from the loss of the TV and typewriter. *See Hoy v. Angelone*, 720 A.2d 745, 754 (Pa. 1998); *Gray v. Huntzinger*, 147 A.3d 924, 928 (Pa. Super. Ct. 2016). However, his allegations are sufficient to support negligence claims. *See*, *e.g.*, *Payne v. Stanbaugh*, No. 1:22-CV-2063, 2025 WL 287243, at *10 (M.D. Pa. Jan. 6, 2025) ("[W]hile Payne has alleged that Stanbaugh confiscated and disposed of his personal property in an intentional and

---

[9] Jackson also asserts property damage claims against Ryan, Harper, and Liptak. Ryan and Liptak were involved in the underlying misconduct report but are not alleged to have caused any damage to Jackson's property itself. Harper allegedly ordered security to confiscate Jackson's "legal box," but the complaint does not indicate that Harper's order was improper or a violation of any duty to Jackson, nor that the order itself caused any loss or damage to Jackson's property.

retaliatory manner in stating his First Amendment claim, he is also entitled to, and indeed has, pled negligent treatment of this property in the alternative."), report and recommendation adopted, 2025 WL 285330 (M.D. Pa. Jan. 23, 2025).

## IV.    CONCLUSION

The Court will thus permit Jackson to proceed on First Amendment retaliation claims and state law negligence claims against Stavola and Detwiler arising from the alleged damage to his TV and typewriter. All other claims will be dismissed. An appropriate Order follows.

**Dated: September 4, 2025**                              *s/ Karoline Mehalchick*
                                                          **KAROLINE MEHALCHICK**
                                                          **United States District Judge**